## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GABRIEL RAMOS,

       Plaintiff,

vs.                                            No. CIV 05-969 JB/RLP

JEFF CARBAJAL, former Grant County Clerk,
and SERGEANT SAM RODRIGUEZ,
in their individual capacities,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Sam Rodriguez's Motion for Summary Judgment and Memorandum in Support, filed June 26, 2006 (Doc. 28)("Motion for Summary Judgment"). The Court heard argument on this motion on November 21, 2006. The primary issues are: (i) whether there is evidence that Plaintiff Gabriel Ramos was engaged in activities that the First Amendment protects which Defendant Sam Rodriguez abridged without justification; (ii) whether Rodriguez violated Ramos' Fourth Amendment right to be free from unlawful seizures; and (iii) whether a reasonable law enforcement officer in Rodriguez' position would have believed he had a reasonable basis for removing Ramos from the Grant County Administration Building ("GCAB"). Because the Court does not believe that the factual record and all reasonable inferences therefrom, when considered in the light most favorable to Ramos, establishes that there is a genuine issue of material fact whether Ramos suffered a violation of his constitutional rights, the Court finds that Rodriguez is entitled to qualified immunity and will grant the motion.

## FACTUAL BACKGROUND

On June 1, 2004, Grant County, New Mexico held a local election under the supervision of Defendant Jeff Carbajal, then Grant County Clerk.  See Motion for Summary Judgment ¶ 2, at 1-2; Plaintiff's Response in Opposition to Defendant Sam Rodriguez's Motion for Summary Judgment ¶ 2, at 2, filed July 14, 2006 (Doc. 29)("Ramos' Response").  At the time of the election, Carbajal was serving as Clerk in an interim capacity, but was running for election to the position.  See First Amended Complaint ¶¶ 7-8, at 2-3, filed May 30, 2006 (Doc. 21)("Complaint").  Ramos represents that, during the campaign preceding the election, he supported Carbajal's opponent, Howard Morales, and campaigned on Morales' behalf.  See Ramos' Response ¶ 11, at 3; Transcript at 11:3-4 (Gonzales).

The election results were tabulated at the County Clerk's office, located in the GCAB, a public building in Silver City, New Mexico.  See Complaint ¶¶ 11-13, at 2-3; Motion for Summary Judgment ¶¶ 2-3, at 1-2.  The GCAB is an administrative office building that houses the offices of the county's clerk, commissioners, and assessor.  See Complaint ¶ 10, at 2; Transcript of Hearing at 15:2-4 (Gonzales)(taken November 21, 2006)("Transcript").[1]  After the polls were closed, Ramos went to the GCAB to observe the election results and to convey the results to a local news radio reporter.  See Complaint ¶ 13, at 3;  Motion for Summary Judgment ¶ 4, at 2.  Ramos was stationed inside the GCAB, but outside the County Clerk's office.  See Complaint ¶ 14, at 3; Answer to Plaintiff's First Amended Complaint ¶ 4, at 1, filed June 23, 2006 (Doc. 27)("Answer").

In response to a "911" call that Carbajal made, Rodriguez, an on-duty Sergeant with the Silver City Police Department, escorted Ramos from the GCAB premises.  See Complaint ¶ 15, at

---

[1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

3; Motion for Summary Judgment ¶¶ 5, 7, at 2; Ramos' Response ¶ 12, at 4. Rodriguez represents that Carbajal indicated to him that Ramos was harassing and intimidating poll workers. See Complaint ¶ 16, at 3; Motion for Summary Judgment, ¶ 6, at 2. Rodriguez removed Ramos based solely on Carbajal's allegations. See Complaint ¶ 19, at 3; Reply Memorandum in Support of Defendant Sam Rodriguez's Motion for Summary Judgment Based on Qualified Immunity at 3-4, filed July 28, 2006 (Doc. 32)("Rodriguez' Reply").

With the exception of Carbajal, Rodriguez did not interview any individuals present at the GCAB at that time. See Ramos' Response ¶¶ 12-13, at 4; Rodriguez' Reply at 3-4. According to a number of witness statements that Ramos proffers, Rodriguez grabbed Ramos by the arm and escorted him from the GCAB. See Complaint ¶ 17, at 3. Rodriguez states that the only physical contact between the men occurred when Ramos patted him on the back and shook his hand. See Motion for Summary Judgment ¶ 9, at 2; Motion for Summary Judgment, Exhibit A, Affidavit of Sam Rodriguez ¶ 5, at 2 (Rodriguez' Affidavit). Rodriguez did not take Ramos into custody. See Motion for Summary Judgment ¶ 9, at 2.

## PROCEDURAL BACKGROUND

Ramos filed his Complaint against Rodriguez on May 30, 2006, asserting that Rodriguez violated Ramos' First Amendment Right to political association and deprived Ramos of his Fourth Amendment Right to be free from unreasonable seizures. See Complaint at 4-5. On June 26, 2006, Rodriguez filed this motion for summary judgment, pursuant to rule 56 of the Federal Rules of Civil Procedure, requesting the Court grant summary judgment on his behalf, because qualified immunity bars Ramos' action against him. See Motion for Summary Judgment at 1.

Rodriguez contends that he is entitled to qualified immunity as a matter of law, because

-3-

Ramos failed to demonstrate that he suffered any constitutional violation and because there was nothing to indicate to Rodriguez that he was violating Ramos' constitutional rights when he asked him to leave.  <u>See</u> Motion for Summary Judgment at 4-7.  On July 13, 2006, Ramos filed a response in opposition to Rodriguez' motion for summary judgment, asserting that Rodriguez is not entitled to qualified immunity, and that the Court should deny his motion for summary judgment.  <u>See</u> Ramos' Response at 2.  Ramos counters that there is evidence in the record that directly disputes Rodriguez' contentions that he had a reasonable basis for removing Ramos from the GCAB and that Ramos voluntarily left the building.  <u>See</u> Ramos' Response at 5.   Ramos further asserts that the law was clearly established at the time of the incident so that a reasonable law enforcement officer would have known that a person may not be evicted from a polling place absent a basis to believe, based on a reasonable investigation, that the person is interfering with the election process or committing a crime.  <u>See</u> Rodriguez' Reply at 10-11.

## STANDARD FOR DECIDING SUMMARY JUDGMENT MOTIONS

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e).  An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. <u>Id.</u> at 249-50 (citations omitted).  Mere assertions or conjecture as to factual disputes are not enough

-4-

to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

The party seeking summary judgment has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case." Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995))(internal quotations omitted).  Upon meeting that burden, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact." Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164 (citations and internal quotations omitted).  "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id.  (citations and internal quotations omitted).

The mere existence of a scintilla of evidence in support of the plaintiff's position is not sufficient; there must be evidence on which the fact finder could reasonably find for the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted).  "In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10 Cir.1996).

When evaluating a motion for summary judgment, the court examines the factual record and

reasonable inference therefrom in the light most favorable to the party opposing summary judgment. See Sigmon v. Community Care HMO, Inc., 234 F.3d 1121, 1124-25 (10th Cir. 2000).  Moreover, the court may consider only admissible evidence when ruling on a motion for summary judgment. See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 506 (1978)).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must establish: (i) that the defendant violated a constitutional right; and (ii) that the constitutional right violated was clearly established.  See Cortez v. McCauley, 438 F.3d 980, 988 (10th Cir. 2006). "If the plaintiff fails to carry either part of [the] two part burden, the defendant is entitled to qualified immunity."  Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995).  The second part of plaintiff's burden "must be undertaken in light of the specific context of the case, not as a broad proposition . . . ."  Saucier v. Katz, 533 U.S. 194, 201 (2001).  "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation."  Id. at 202.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff

maintains."  Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

In making this determination, the Court will view the evidence in the light most favorable to the non-moving party; however, the record must demonstrate that the plaintiff has satisfied his heavy two-part burden.  See Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  "Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful."  Cortez v. McCauley, 438 F.3d at 988.  If the plaintiff establishes both a violation of a constitutional right and that the right was clearly established at the time of the alleged conduct, the burden shifts to the defendant, who must demonstrate that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law.  See id.  If there is a factual dispute involving an issue on which the qualified immunity turns, summary judgment based on a qualified immunity defense in a 42 U.S.C. § 1983 action is not appropriate.  See Poe v. Haydon, 853 F.2d 418, 426 (6th Cir. 1988).

In determining whether a defendant is entitled to qualified immunity, a court cannot assume that a constitutional violation exists; rather, a court must consider the constitutional violation issue before taking up the clearly established issue.  See Kirkland v. St. Vrain Valley School Dist. No. RE-1J, 464 F.3d 1182, 1188-89 (10th Cir. 2006).

## LAW REGARDING FIRST AMENDMENT RETALIATION CLAIMS

In addition to prohibitive laws, the Constitution also proscribes "[g]overnment retaliation . . . in as much as retaliatory actions tend to chill individuals' exercise of constitutional rights."  How v. City of Baxter Springs, No. 06-3022, 2007 U.S. App. LEXIS 4083, *29 (10th Cir. Feb. 22, 2007).  See Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005)("The First Amendment bars retaliation for exercising the right of association.").  The United States Court of Appeals for the Tenth Circuit

has explained that "any form of official retaliation for exercising one's freedom of speech, including

prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an

infringement of that freedom." How v. City of Baxter Springs, 2007 U.S. App. LEXIS 4083 at *29

(quoting Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)).  To establish a claim of retaliation,

outside the employment context, for exercising the right to associate guaranteed under the First

Amendment, a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally

protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would chill

a person of ordinary firmness from continuing to engage in that activity; and (iii) the plaintiff's

exercise of the constitutionally protected activity substantially motivated the defendant's adverse

action.  See Perez v. Ellington, 421 F.3d at 1131-32 (quoting Worrell v. Henry, 219 F.3d at 1212).

## LAW REGARDING FIRST AMENDMENT RIGHT TO POLITICAL ASSOCIATION

The First Amendment provides that "Congress shall make no law . . . prohibiting . . . the right

of the people peaceably to assemble, and petition the Government for a redress of grievances."  U.S.

Const. amend. I.  Included among the protections the First Amendment guarantees, the Supreme

Court of the United States has recognized " a First Amendment right to associate for the purpose of

speaking, which [it has] termed a 'right of expressive association.'"  Rumsfeld v. Forum for Academic

& Institutional Rights, Inc., 126 S. Ct. 1297, 1311-12 (2006)(quoting Boy Scouts of Am. v. Dale,

530 U.S. 640, 644 (2000). See Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643,

658 (10th Cir. 2006)("In addition to freedom of speech, the First Amendment also implicitly protects

the corresponding freedom to expressive association.").  The First Amendment protects associational

rights in two distinct ways: (i) it "protects against unjustified government interference with an

individual's choice to enter into and maintain certain intimate or private relationships;" and (ii) it

ensures "the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities." Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 544 (1987). See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658.

Because the "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution," the First Amendment affords its "broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Buckley v. Valeo, 424 U.S. 1, 14 (1976)(quoting Roth v. United States, 354 U.S. 476, 484 (1957)). See Bass v. Richards, 308 F.3d 1081, 1089 (10th Cir. 2002)(quoting Buckley v. Valeo, 424 U.S. at 14). Specifically, speech related to an individual's assessment of a particular candidate's fitness for public office, or comparing the relative merits of competing candidates, "is at the core of protected speech." Bass v. Richards, 308 F.3d at 1089. See Gardetto v. Mason, 100 F.3d 803, 812 (10th Cir. 1996)("[T]he advocacy of a particular candidate for public office is the type of core political speech the First Amendment was designed to protect."). Accordingly, "[i]n light of the importance of political speech to republican government," Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 427 (2000)(Thomas, J., dissenting), when restrictions on "core political speech" are at issue, the Supreme Court has ordinarily evaluated those restrictions under a strict scrutiny standard, Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 207 (1999)(Thomas, J., concurring in judgment). See Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1099 (10th Cir. 2006)(en banc)(acknowledging that restrictions on political speech trigger strict scrutiny constitutional analysis).

"The right to associate for expressive purposes is not, however, absolute," and the Supreme

Court has cautioned that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984). See Nat'l Commodity & Barter Ass'n v. Archer, 31 F.3d 1521, 1531 (10th Cir. 1994)(quoting Roberts v. U.S. Jaycees, 468 U.S. at 623). Moreover, "[e]ven protected speech is not equally permissible in all places and at all times." Frisby v. Schultz, 487 U.S. 474, 479 (1988)(quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799 (1985)). With respect to activities on government property, the Constitution does not require "the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 799-800.

Consistent with this understanding, the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." United States v. Kokinda, 497 U.S. 720, 726 (1990).

> Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny. Regulation of speech on property that the Government has expressly dedicated to speech activity is also examined under strict scrutiny. But regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness.

Id. at 726-27 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983))(internal citations omitted). This tripartite framework is necessary because "[t]he First

Amendment does not guarantee access to property simply because it is owned or controlled by the government." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 803.  The Supreme Court has explained that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129-30 (1981)).

Federal courts have held that government office buildings that have not traditionally been opened to the public for expressive activity are non-public fora.  See Mainstream Loudoun v. Bd. of Trs. of the Loudoun County Library, 24 F. Supp. 2d 552, 562 (E.D. Va. 1998)(categorizing a government office building as a non-public forum, and distinguishing the office building from such fora as school board meeting places and municipal theaters).  This designation stems from the recognition that, the government workplace, "like any place of employment, exists to accomplish the business of the employer." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 805. When acting in its capacity as an employer, the government "must have wide discretion and control over the management of its personnel and internal affairs." Arnett v. Kennedy, 416 U.S. 134, 168 (1974)(Powell, J., concurring in part and concurring in the result in part).  Consequently, "[i]t follows that the Government has the right to exercise control over access to the [] workplace in order to avoid interruptions to the performance of the duties of its employees." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 805-06.  Finally, the question whether a polling place on election day is a "traditional public forum" is not settled under Supreme Court precedent.  Burson v. Freeman, 504 U.S. 191, 216 (1992)(Scalia, J., concurring in judgment)(disagreeing with plurality opinion and asserting that "the environs of a polling place, on election day, are simply not a

-11-

'traditional public forum' -- which means that they are subject to speech restrictions that are reasonable and viewpoint neutral")(quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46).   Cf. Marlin v. D.C. Bd. of Elections & Ethics, 236 F.3d 716, 719 (D.C. Cir. 2001)(deciding that the interior of a polling place was not a traditional public forum nor a government-designated one, because it is not available for general public discourse and "[t]he only expressive activity involved is each voter's communication of his own elective choice and this has long been carried out privately -- by secret ballot in a restricted space").

## LAW REGARDING FOURTH AMENDMENT RIGHT
## TO BE FREE FROM UNLAWFUL SEIZURE

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures, shall not be violated." U.S. Const. amend. IV.  The Fourth Amendment's protections extend beyond the scope of the criminal arena, and apply "whenever government authorities take an individual into custody against his will."  United States v. Villagrana-Flores, 467 F.3d 1269, 1273 (10th Cir. 2006).  In assessing the various degrees of Fourth Amendment protection, the Supreme Court has identified three encounters between law enforcement personnel and citizens: (i) consensual encounters; (ii) investigative stops; and (iii) formal arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  To determine the constitutionality of a particular encounter, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  Tennessee v. Garner, 471 U.S. 1, 8 (1985)(quoting United States v. Place, 462 U.S. 696, 703 (1983)).

"Consensual encounters between police and citizens are not considered 'seizures' within the

meaning of the Fourth Amendment and consequently do not require any suspicion of criminal wrongdoing." United States v. Villagrana-Flores, 467 F.3d at 1273.  Law enforcement officers merely approaching individuals and posing questions to them does not implicate the Fourth Amendment if they are willing to listen and voluntarily answer. See United States v. Drayton, 536 U.S. 194, 200 (2002); Florida v. Royer, 460 U.S. 491, 497 (1983)(plurality opinion).  Accordingly, "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. at 201). See California v. Hodari D., 499 U.S. 621, 627-28 (1991)("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.")(quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

Unlike consensual encounters, investigative stops -- brief stops of persons or vehicles that fall short of traditional arrests -- are "seizures" within the Fourth Amendment and therefore require that law enforcement officers "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Villagrana-Flores, 467 F.3d at 1273 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  The Supreme Court has determined that, in the context of an investigative stop, the "balance between the public interest and the individual's right to personal security, tilts in favor of a standard less than probable cause," and therefore "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." United States v. Arvizu, 534 U.S. 266, 273 (2002)(internal citations and quotations omitted).  In evaluating a law enforcement officer's decision to conduct an investigative stop, courts consider "the officer's conduct 'in light of common sense and ordinary

human experience,' deferring to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006)(quoting United States v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996)).  Moreover, "[a]lthough an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. at 274 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 27 (1968)).

A formal arrest "is 'characterized by highly intrusive or lengthy search or detention,' and must therefore be supported by probable cause." United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(quoting Oliver v. Woods, 209 F.3d at 1185).  The Supreme Court has explained that "'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  Although probable cause does not require facts that establish certain guilt, it does require more than mere suspicion on the part of the officer making the arrest.  See United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001).  Finally, because the existence of probable cause is judged on an objective standard, the threshold question is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." United States v. Valenzuela, 365 F.3d at 896-97 (quoting Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)).

## ANALYSIS

This  motion involves only Ramos' claims against Rodriguez, the arresting police officer.

Rodriguez argues that Ramos has failed to demonstrate that he suffered a violation of a federally protected right, and that Ramos has not presented any Supreme Court or Tenth Circuit decision that would indicate to Rodriguez that he was violating any of Ramos' rights when he escorted him off the GCAB premises.  See Motion for Summary Judgment at 7.  In light of these factors, Rodriguez requests the Court grant him summary judgment on the basis that qualified immunity bars Ramos' suit against him.  See id. at 1.  Because the Court does not believe that the factual record and all reasonable inferences therefrom, when considered in the light most favorable to Ramos, establishes a genuine issue of material fact that Ramos suffered a violation of his constitutional rights, the Court finds that Rodriguez is entitled to qualified immunity and will enter summary judgment on his behalf.

## I.    RAMOS HAS NOT DEMONSTRATED THAT RODRIGUEZ VIOLATED ANY OF HIS RIGHTS PROTECTED UNDER THE FIRST AMENDMENT.

Ramos contends that he, along with others, were monitoring and discussing the Grant County election results in a forum established for that very purposes.  See Ramos' Response at 6.  As a result, Ramos asserts that he was "clearly engaged in political speech and associational activities, under the umbrella of the First Amendment."  Id.  Rodriguez counters that, despite Ramos' characterization of the GCAB, Ramos was not in a traditional public forum and therefore his First Amendment rights were subject to reasonable regulation if that regulation is viewpoint neutral.  See Rodriguez' Reply at 2.

The Court notes that Ramos has framed the First Amendment portion of his Complaint as a violation of his right to political association.  See Complaint ¶ 27, at 4.  While the Court can imagine other rights that might be implicated in this case, such as a right to access to public buildings and officials, a candidate for public office's right to have votes counted properly, and members of the

media's right to access to election results, Ramos has not alleged violations of any of these rights. Moreover, while Ramos contends that he had previously campaigned for Carbajal's opponent, that he went to the GCAB to monitor election results, and that he agreed to convey those results to a local news radio reporter, he does not assert that he was at the GCAB on behalf of any specific candidate or electoral monitoring organization, or as a member of the media. Accordingly, the Court will confine its analysis to what Ramos and Rodriguez have agreed, i.e., whether Rodriguez' actions violated Ramos' right, as a private citizen, to political association.

Ramos represents that his claim "is limited to an invalid infringement of protected First Amendment rights, as opposed to retaliation." Ramos' Response at 6 n.4. Consequently, Ramos asserts that the three-element test that the Tenth Circuit applies to First Amendment retaliation claims, see Perez v. Ellington, 421 F.3d at 1131-32, is inapplicable, see Ramos' Response at 6 n.4. Ramos does not, however, indicate what test is applicable to his case or articulate the elements of the First Amendment claim he alleges. Nor does he point out any preemptively proscriptive action in which Rodriguez, or any other party, engaged to deprive him of his First Amendment rights. Absent this showing, and considering all of Rodriguez' action occurred in response to the activities that Ramos contends were constitutionally protected, the Court is uncertain how it could analyze Ramos' claim as anything but a claim for retaliation.

Accordingly, to establish a violation of the right to associate under the First Amendment, Ramos must demonstrate: (i) he was engaged in constitutionally protected activity; (ii) Rodriguez' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) Ramos' exercise of constitutionally protected activity substantially motivated Rodriguez' action. Because, when the evidentiary record and all reasonable inferences

-16-

therefrom are viewed in the light most favorable to Ramos, he has not demonstrated a genuine issue of material fact regarding whether he was engaged in constitutionally protected activity, the Court finds that Ramos has not sufficiently alleged a First Amendment violation.

Although there is no doubt that political speech -- in the form of political association -- related to an individual's preference of a candidate for public office, or expressing that individual's opinion regarding the relative merits of competing candidates, "is at the core of protected speech," Bass v. Richards, 308 F.3d at 1089, "even protected speech is not equally permissible in all places and at all times," Frisby v. Schultz, 47 U.S. at 479. Depending on the nature of the forum in which political expression is regulated, and the magnitude of the state interest that the speech might disrupt, associational freedoms may be regulated and/or restricted. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 799-800. Because, to the extent that Ramos' response can be interpreted to categorize the GCAB as a traditional public forum, his categorization is inaccurate, and, because Ramos has not fully taken into account competing interests present at the GCAB, he has not demonstrated an actionable violation of his right to political association under the First Amendment.

There is no factual dispute that Ramos went to the GCAB, a building where employees of the County Clerk's office were tabulating election results, to monitor those results and to report the results to a local news radio reporter. Ramos asserts that, while present at the GCAB, he was "discussing the election in a forum established for that very purpose." Ramos' Response at 6.

The Court notes that, although both Ramos and Rodriguez describe the GCAB as a "polling place" in their briefing on this motion, see Ramos' Response at 6; Rodriguez' Reply at 2, no voting occurred at the GCAB, see Transcript at 15:7-9 (Gonzales); id. at 17:3-6 (White). Ramos does not

-17-

specifically characterize the GCAB as a traditional public forum or as a forum specifically dedicated to speech activity, because he asserts that the level of scrutiny to which Rodriguez' action should be subject is irrelevant.  See id.  Ramos contends that, "even under the lowest standard," -- which the Court will interpret as the reasonableness standard applicable to government property that cannot be classified as a traditional public forum and which has not been dedicated for speech purposes -- "Rodriguez had no reasonable basis to evict Ramos from the [GCAB]."  Id.

Neither party has presented any evidence that the GCAB was traditionally open to the public for expressive discourse or was more than a government office building.  The Supreme Court has noted that, the government workplace, "like any place of employment, exists to accomplish the business of the employer," Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 805, and that "the Government has the right to exercise control over access to the [] workplace in order to avoid interruptions to the performance of the duties of its employees," id. at 805-06.  In accordance with these principles, federal courts have held that government office buildings are non-public fora, see Mainstream Loudoun v. Bd. of Trs. of the Loudoun County Library, 24 F. Supp. 2d at 562, and therefore regulation of First Amendment activity in government office buildings is subject to reasonableness review.

Even if the GCAB could properly be designated as a polling place, however, for the purposes of this motion, the distinction is not meaningful.  In Burson v. Freeman, the Supreme Court reviewed the constitutionality of a Tennessee election law that prohibited the solicitation of votes and the distribution of campaign materials within 100 feet of the entrance to the polling place.  See 504 U.S. at 193.  In a plurality opinion that Justice Blackmun authored -- and that Chief Justice Rehnquist and Justices White and Kennedy joined -- the plurality observed that the law regulated speech in

-18-

"quintessential public forums" such as parks, streets, and sidewalks adjacent to polling places, and noted that it did not reach non-political categories of speech.  Id. at 196-97.  Consequently, the plurality characterized the law as a "facially content-based restriction on political speech in a public forum" and therefore subject to "exacting scrutiny."  Id. at 198.

The plurality in Burson v. Freeman noted that, for Tennessee's law to be constitutional, the right to engage in political discourse must be reconciled with the right to vote.  See id.  Without disregarding the importance of free political expression, the plurality recognized Tennessee's compelling interests in protecting voters from confusion and undue influence, and in preserving the integrity of its election process.  See id. at 199.  The plurality also acknowledged the long history of laws in all fifty states -- and in a number of other western democracies -- restricting access to some zone around the voting compartment, and concluded that, although the environs around the polling place were often places that could be classified as traditional public fora, Tennessee's regulation of speech in those areas was a constitutional compromise, because "some restricted zone around the voting area is necessary to secure the State's compelling interest."  Id. at 208 (emphasis in original).

Justice Scalia, concurring in judgment in Burson v. Freeman, agreed with the plurality's result, but did not believe the question was as difficult as the plurality posited it to be, because, in his view, "the streets and sidewalks around polling places have traditionally not been devoted to assembly and debate."  Id. at 216 (Scalia, J., concurring in judgment)(emphasis in original).  Justice Scalia noted that restrictions on speech around the polling place on election day have been prevalent since at least the late 19th century, and stated that, "[b]ecause restrictions on speech around polling places on election day are as venerable a part of the American tradition as the secret ballot, [Tennessee's law] does not restrict speech in a traditional public forum, and the 'exacting scrutiny' that the plurality

purports to apply is inappropriate." Id. at 215 (Scalia, J., concurring in judgment)(internal cross reference omitted).  Justice Scalia emphasized that "the long usage of our people demonstrates that the portions of streets and sidewalks adjacent to polling places are not public forums at all times," id. at 216 (Scalia, J., concurring in judgment)(emphasis in original), and declared that Tennessee's law, "though content based, is constitutional because it is a reasonable, viewpoint-neutral regulation of a nonpublic forum," id. at 214 (Scalia, J., concurring in judgment).

Justice Stevens filed a dissent in Burson v. Freeman in which Justices O'Connor and Souter joined.[2]  While Justice Stevens disagreed with the plurality that Tennessee's law was narrowly tailored to achieve a substantial state interest, he did not quarrel with the fundamental principle that speech, at least within the polling place, could be regulated.  In Burson v. Freeman, Justice Stevens argued that the reach of Tennessee's statute was overly broad to secure the compelling state interests that the plurality had identified, but he conceded that "there is no disagreement that the restrictions on campaigning within the polling place are constitutional; the issue is not whether the State may limit access to the "area around the voter" but whether the State may limit speech in the area around the polling place."  Id. at 220 n.4 (Stevens, J., dissenting)(emphasis in original).

In sum, all eight Supreme Court justices that participated in Burson v. Freeman concluded that the interior of the polling place, at least on election day, was a forum subject to regulation to accommodate the state's compelling interests in preventing voter intimidation and election fraud.  Indeed, five of the eight justices held that Tennessee's law limiting political speech around the polling place on election day was a constitutional compromise.  Cf. Marlin v. D.C. Bd. of Elections & Ethics,

---

[2]Only eight justices participated in the consideration of Burson v. Freeman.  Justice Thomas took no part in the decision or consideration of the case.

236 F.3d at 719 (D.C. Cir. 2001)(deciding that the interior of a polling place was not a traditional public forum nor a government-designated one because it is not available for general public discourse and "[t]he only expressive activity involved is each voter's communication of his own elective choice and this has long been carried out privately -- by secret ballot in a restricted space").  Consequently, irrespective whether the GCAB is classified as a government office building or as a polling place, if Rodriguez removed Ramos from the GCAB in accordance with an applicable, reasonable, viewpoint-neutral regulation, his action was constitutional.

In his affidavit, Rodriguez asserts that, in removing Ramos from the GCAB, he was acting in accordance with N.M. Stat. Ann. § 3-8-77, which prohibits "any act which knowingly interferes with or impedes the legal conduct of [an] election or the legal performance of any election official's duties."  N.M. Stat. Ann. § 3-8-77(E)(1).  See Rodriguez' Affidavit ¶ 6, at 2.  In his briefing on this motion, Rodriguez does not refer to N.M. Stat. Ann. § 3-8-77, but asserts he was acting in accordance with N.M. Stat. Ann. §§ 3-8-39(D) and 1-12-4(D), which permit election judges in municipal and state elections to call upon law enforcement officers to assist in maintaining order at the polling place and directs officers to render assistance when they are so called, and N.M. Stat. Ann. § 30-20-13(C), which makes it a misdemeanor for a person to refuse to leave state property at the property custodian's request if that person's conduct threatens to disrupt the government function occurring on the property.  See Motion for Summary Judgment at 4.  The Court understands that, in considering a motion for summary judgment, it must base its decision on the parties' pleadings, depositions, answers to interrogatories, admissions on file, and affidavits; the Court should not rely on mere assertions, conjecture, or unsubstantiated allegations in the parties' memoranda. Nevertheless, because, in his response to Rodriguez' motion for summary judgment, Ramos

addressed not only N.M. Stat. Ann. § 3-8-77, but also those statutes that Rodriguez cites in his memorandum, see Ramos' Response at 7, and, because the Court concludes that its result would be the same whether it analyzed N.M. Stat. Ann. § 3-8-77 alone or all the statutes in conjunction, the Court will address all the statutory authority Rodriguez invokes.

Ramos contends that Rodriguez' reliance on these statutes is misplaced, because there is no evidence in the record that Rodriguez observed any disorder in the GCAB. See Ramos' Response at 7. Ramos asserts, and Rodriguez concedes, that Rodriguez escorted Ramos from the GCAB solely because of information he received from Carbajal. Ramos' argument, however, adds a requirement that is not contained in the plain language of N.M. Stat. Ann. §§ 3-8-39(D), 1-12-4(D), or 30-20-13 (C). The Court notes that, if the GCAB can be considered a polling place on election day, N.M. Stat. Ann. § 3-8-77 expressly prohibits "any act which knowingly interferes with or impedes the legal conduct of the election of the legal performance of any election official's duties." N.M. Stat. Ann. § 3-8-77(E)(1). As enforcement provisions, neither N.M. Stat. Ann.§ 3-8-39(D) nor N.M. Stat. Ann. § 1-12-4(D) require that law enforcement officers called to assist in establishing order in a polling place conduct an independent investigation of the premises or personally witness the polling place in disorder. The statutes merely state that when called, an officer "shall render assistance." See N.M. Stat. Ann. § 1-12-4(D) ("The presiding judge or any election judge may call upon any peace officer to assist in the maintenance of order in the polling place. When so requested, the peace officer shall render assistance."); N.M. Stat. Ann. § 3-8-39(D) ("The election judges may request any state or local law enforcement officer to assist in the maintenance of order in the polling place. When so requested, the law enforcement officer shall render assistance.").

Thus, assuming without deciding that the GCAB could be considered a polling place, the

Court believes that N.M. Stat. Ann. §§ 3-8-77, 3-8-39(D) and 1-12-4(D) are reasonably related to New Mexico's interests in protecting voters from intimidation at the polls and from preventing disruptions that might undermine the integrity of state elections. The statutes are viewpoint neutral, and do not depend on the nature of or the reason for the disruption a particular citizen's presence at the polling place might cause. Polling places on election day can be emotional and competitive locations. The Court believes that the New Mexico statutes at issue recognize that reality and are reasonably targeted to the expedient restoration of the order that is necessary to ensure that each voter is given the opportunity to vote his conscience free from coercion, and that the election is conducted with the integrity and institutional efficiency necessary to ensure accuracy and accommodate voting's central place in our republican system.

Even if the GCAB cannot properly be characterized as a traditional polling place, Rodriguez argues that the facts of this case fall within the scope of the protections N.M. Stat. Ann. §§ 3-8-39(D) and 1-12-4(D) were designed to afford. See Transcript at 17:7-18:9 (White). Both statutes are entitled "Conduct of election; maintenance of order,"[3] and Rodriguez contends that, because the tabulating of votes is an integral component of the election process, the statutes incorporate the need to maintain order during the counting, as well as the voting, process. See N.M. Stat. Ann. § 1-12-14; N.M. Stat. Ann. § 3-8-39; Transcript at 17:13-18 (White). Because Rodriguez also asserts that N.M. Stat. Ann. § 30-20-13, a general statute that prohibits interference with government officials' performance of their official duties on government property, validated his actions, and because the Court believes that, if Rodriguez reasonably believed the GCAB was a polling place he is entitled to

---

[3]The full title of N.M. Stat. Ann. § 1-12-14 is "Conduct of election; maintenance of order." N.M. Stat. Ann. § 1-12-14. The full title of N.M. Stat. Ann. § 3-8-39 is "Conduct of election; maintenance of order; peace officer; memoranda of actions or omissions." N.M. Stat. Ann. § 3-8-39.

qualified immunity, the Court need not decide that issue to resolve this motion.

New Mexico law provides that "[n]o person shall, at or in any building . . . owned, operated or controlled by the state or any of its political subdivisions, willfully impede the staff or a public official . . . through the use of restraint, abduction, coercion or intimidation." N.M. Stat. Ann. § 30-20-13(C). State law also prohibits an individual from failing to leave state premises when a custodian of the premises requests he leave, "if the person is committing, threatens to commit or incites others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of the property, building or facility." N.M. Stat. Ann. § 30-20-13(D). In the context of conducting an election, the Court believes that N.M. Stat. Ann. § 30-20-13 is related to many of the same interests that N.M. Stat. Ann. §§ 3-8-77, 3-8-39(D), and 1-12-4(D) are designed to promote.

In addition, the State, and hence the public, has an interest in ensuring government operate efficiently "if the Government is to perform its responsibilities effectively and economically." Arnett v. Kennedy, 416 U.S. at 168 (Powell, J., concurring in part and concurring in the result in part). The Court believes that N.M. Stat. Ann. § 30-20-13 is reasonably related to this interest. The statute is viewpoint neutral, and does not depend on the nature of or the reason for the disruption a particular citizen's presence at a government building might cause, and only provides for exclusion when that citizen's presence interferes with the efficient performance of official duties. The Court believes that Rodriguez was acting within the scope of N.M. Stat. Ann. § 30-20-13, and that the statute is reasonably related to the achievement of compelling state interests. Accordingly, the Court finds that Rodriguez did not violate Ramos' First Amendment right to political association when he escorted Ramos from the GCAB at Carbajal's direction.

Finally, the Court believes that whether the GCAB was actually a polling place as a matter of law is irrelevant because Rodriguez reasonably believed it to be one. See Rodriguez' Affidavit ¶ 6, at 2. The Supreme Court has acknowledged that a law enforcement officer's qualified immunity is not undermined because of a reasonable mistake of law or fact. See Butz v. Economou, 438 U.S. 478, 507 (1978)("Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law."); Groh v. Ramirez, 540 U.S. 551, 567 (2004)(Kennedy, J., dissenting)("Our qualified immunity doctrine applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."). Consequently, if Rodriguez reasonably believed that the GCAB was a polling place, or that N.M. Stat. Ann. §§ 3-8-77, 3-8-39 and/or 1-12-4 were applicable at the time he removed Ramos from the building, he is entitled to qualified immunity.

The Court does not believe it was unreasonable for Rodriguez to believe the GCAB was a polling place or that polling place laws applied to the GCAB at the time he removed Ramos from the building. Indeed, that both parties to this litigation have described the GCAB as a polling place and engaged in considerable analysis and argument related to polling places' forum classification lends credence to Rodriguez' belief. Moreover, while the titles of three of the statutes Rodriguez cites refer to "polling places," each also contains language referencing the conduct of elections and maintaining order throughout the electoral process. See N.M. Stat. Ann. § 3-8-77 (prohibiting "any act which knowingly interferes with or impedes the legal conduct of the election or the legal performance of any election official's duties"); N.M. Stat. Ann. § 3-8-39 (entitled "Conduct of election; maintenance of order; peace officer; memoranda of actions or omissions"); N.M. Stat. Ann. § 1-12-4 (entitled "Conduct of election; maintenance of order").

## II.   RAMOS HAS NOT DEMONSTRATED THAT RODRIGUEZ VIOLATED ANY OF HIS RIGHTS PROTECTED UNDER THE FOURTH AMENDMENT.

In assessing the various degrees of Fourth Amendment protection, the Supreme Court has identified three encounters between law enforcement personnel and citizens: (i) consensual encounters that do not implicate the Fourth Amendment; (ii) investigative stops for which law enforcement personnel must have reasonable suspicion; and (iii) formal arrests that require law enforcement personnel to establish probable cause. Rodriguez asserts that Ramos has not suffered a constitutional violation under the Fourth Amendment, because the encounter between himself and Ramos was consensual and therefore does not implicate Fourth Amendment protection and does not give rise to a cause of action under 42 U.S.C. § 1983. See Motion for Summary Judgment at 4. Ramos concedes that his encounter with Rodriguez did not result in a formal arrest, see Ramos' Response at 8 n.7 ("The third type of encounter -- arrest -- is not at issue in this case; Ramos does not claim that Rodriguez arrested him."), but contends that the encounter was an investigative detention for which Rodriguez did not have reasonable suspicion, see id. at 8-9.

Courts will consider a seizure to have occurred "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." United States v. Ojeda-Ramos, 455 F.3d at 1183 (quoting Terry v. Ohio, 392 U.S. at 19 n.16). In assessing whether a citizen voluntarily complied with a law enforcement officer's directives, the Tenth Circuit has articulated a number of factors for courts to consider.

> 1) the threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects . . .; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed place; 8) and absence of other members of the public.

-26-

Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005)(quoting United States v. Hill, 199 F.3d 1143, 1147-48 (10th Cir. 1999)).  The Tenth Circuit has emphasized that none of these factors is dispositive and that the list is not exhaustive.  See Jones v. Hunt, 410 F.3d at 1226.

Ramos does not contend that more than one officer approached him.  In his affidavit, Ramos indicates that as Rodriguez approached him, he saw Rodriguez' gun in his holster, but he does not suggest that Rodriguez otherwise brandished his weapon or made any reference to it.  See Ramos' Response, Exhibit 1, Affidavit of Gabriel Ramos ¶ 8, at 2 ("Ramos' Affidavit").  Similarly, Ramos contends that Rodriguez "grabbed me by the arm [] and he led me out," but he does not assert any other physical contact or physical intimidation.  Id.

Ramos does not contend that Rodriguez used aggressive or commanding language.  To the contrary, Ramos states that Rodriguez explained to him that Carbajal had informed him that Ramos was disrupting the election process and harassing election employees, and that Carbajal had requested Ramos be removed from the premises.  See id.  Ramos has not presented any evidence that Rodriguez ever seized or retained, for any period of time, any of Ramos' personal effects. Rodriguez did not request Ramos accompany him to the police station or to any other location; with the exception of the GCAB, Ramos was free to go anywhere he chose.  Finally, as the affidavits that Ramos has attached to his response to Rodriguez' motion for summary judgment demonstrate, the encounter occurred in a public building in the presence of numerous other members of the public.  See Ramos' Response, Exhibits 2-6.

Ramos represents that he cooperated with Rodriguez' requests because he feared that if he did not, he would be arrested, but he does not present any evidence that Rodriguez made any

suggestion to that regard.  See Ramos' Affidavit ¶ 9, at 2.  Although Ramos asserts that he "did not feel free to resist [Rodriguez'] actions to remove [him] from the premises," id., he  has not asserted, in his complaint, in his response to Rodriguez' motion for summary judgment, or in any of his supporting affidavits, that Rodriguez ever confined him, took him into custody, or put him in a position where he was not otherwise free to terminate the encounter.

In United States v. Ojeda-Ramos, the Tenth Circuit discussed the application of the "free to leave" standard in the context of a case like Ramos' -- where a citizen's encounter with a law enforcement officer involves the officer requesting the citizen perform some affirmative act.  In United States v. Ojeda-Ramos, the defendant was traveling cross-country on a Greyhound bus from California to New Jersey.  See 455 F.3d at 1179.  During a rest-stop in Tulsa, Oklahoma, all the passengers left the bus at the driver's request, and a Tulsa Police Officer, Pat Dunlap, had a canine sniff the bus' cargo bays.  See id.  The dog alerted to a locked blue suitcase bearing a luggage tag listing the defendant's name.  See id.  When the passengers reboarded the bus, Dunlap, posing as a Greyhound employee, informed the passengers that the bus had mechanical problems, and that they should exit the bus, claim their luggage, and await the arrival of a replacement bus.  See id.  After the passengers exited the bus, Dunlap approached the defendant, identified himself as a police officer, and obtained the defendant's permission to speak with him.  See id. at 1180.  Dunlap requested to see the defendant's bus ticket and identification, both of which matched the name on the luggage tag attached to the blue suitcase.

On appeal, the defendant in United States v. Ojeda-Ramos contested the district court's finding that Dunlap's direction to the passengers that they exit the bus and claim their luggage, made while disguised as a Greyhound employee, was not a seizure.  See id. at 1181.  In affirming the

-28-

district court's finding, the Tenth Circuit reasoned:

> Dunlap's order to leave the bus and claim luggage was not a seizure and would not have been even if he had identified himself as a police officer. He wanted the passengers to comply, but he did not demand, intimidate, threaten or use force against them. However compulsory Dunlap's order may have appeared, it would not have left an impression upon a reasonable person that he was not "free to leave." After all, Dunlap required the passengers to leave the bus, not remain on it. The passengers were not only free to leave, they could have ignored Dunlap's request to claim their luggage.  "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."

Id. at 1183-84 (quoting United States v. Drayton, 536 U.S. at 205)(footnotes omitted).  The Tenth Circuit emphasized that the defendant in United States v. Ojeda-Ramos acted voluntarily in claiming his luggage, and that, when he left the bus, he was free to continue away from the boarding area, and could have even left the bus station.  See 455 F.3d at 1184.

Although Rodriguez almost certainly wanted Ramos to comply with his order to leave the GCAB, Ramos has not presented evidence that Rodriguez employed demands, intimidation, threats, or force to compel him to leave.  Ramos was never detained, confined, or taken into custody.  The irony in Ramos' allegations of a Fourth Amendment seizure is that he was not only free to leave and terminate his encounter with Rodriguez, Rodriguez actually requested that he do so.

Ramos represents that he complied with the order because he feared that if he did not, he might be arrested.  See Ramos' Affidavit ¶ 9, at 2.  Ramos does not, however, present any evidence that Rodriguez told him this was the case, or explained to him potential consequences of failing to comply with the order.  Moreover, even if Ramos' assertion that he feared being arrested is true, it does not modify the nature of his compliance with Rodriguez' request he leave the GCAB.  See United States v. Drayton, 536 U.S. at 205 ("While most citizens will respond to a police request, the

fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.").

In any case, while there is a strong argument that the encounter was consensual, the Court need not rest its decision on the distinction between a consensual encounter and an investigative detention, and thus need not decide whether Ramos' encounter with Rodriguez was consensual. Even if the Court were to adopt Ramos' argument and characterize the encounter between Ramos and Rodriguez as an investigative detention, it still does not believe, when viewing the evidence in the light most favorable to Ramos, that he has established a Fourth Amendment violation. Ramos appears to base his argument on the premise that, any seizure that occurred was unreasonable because Rodriguez, in removing Ramos, relied solely on Carbajal's allegations and ignored witnesses who directly contradicted those allegations. See Ramos' Response at 8. Ramos contends that "[a] jury could conclude from the evidence that Rodriguez lacked a reasonable basis to believe that Ramos was interfering with the election officials' duties, or harassing those officials, and that Rodriguez should not have ousted Ramos." Id.

Ramos cites Baptiste v. J.C. Penney Co., 147 F.3d 1252 (10th Cir. 1998), for the proposition that "police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation." Ramos' Response at 7 (quoting Baptiste v. J.C. Penney Co., 147 F.3d at 1259). See Transcript at 12:18-22 (Gonzales)(citing Baptiste v. J.C. Penney Co., 147 F.3d at 1259). In Baptiste v. J.C. Penney Co., J.C. Penney security guards had detained the plaintiff, Sylvia E. Baptiste, in a basement office and accused her of shoplifting a ring after watching Baptiste on a store monitor. See 147 F.3d at 1254. In the basement office, Baptiste emptied the contents of the bags she was carrying and

-30-

produced receipts for the items she had purchased.  See id.  Subsequently, two police officers responded to the security guards' request for assistance with Baptiste.  See id. at 1255.  The officers spoke with the guards, watched the videotape, questioned Baptiste, compelled her to empty her belongings and produce receipts, and subjected her to a pat-down search.  See id.

Baptiste filed a lawsuit under 42 U.S.C. § 1983 against the police officers, asserting that they violated her Fourth Amendment right to be free from unreasonable searches and seizures.  See id. at 1254.  Because both parties in Baptiste v. J.C. Penney Co. agreed that Baptiste was under arrest at the time she was searched and detained, the district court and the Tenth Circuit confined their analysis to whether the police officers had probable cause to believe that Baptiste had committed a crime.  See id. at 1256.  In affirming the district court's holding that the officers were not entitled to qualified immunity, the Tenth Circuit emphasized the availability of surveillance videotape that it concluded "does not suggest criminal conduct, but is instead consistent with Ms. Baptiste's version of events." Id. at 1259.  In light of this objective and available evidence, the Tenth Circuit concluded that the officers' assertion of probable cause based entirely on the security guards' interpretation of the videotape was an impermissible delegation of their duty to investigate.  See id.  The Tenth Circuit in Baptiste v. J.C. Penney Co. explained that, because the officers watched the videotape, the guards' interpretation of the videotape added nothing to the officer's analysis, and that, because the other information the officers' possessed -- the fruitless search of Baptiste's bags, Baptiste's production of receipts for the items in her possession, and her explanation of the events -- tended to undermine a finding of probable cause, a reasonable police officer would not have believed there was probable cause to arrest Baptiste.

The flaw in Ramos' argument and his reliance on Baptiste v. J.C. Penney Co. is that he

overstates the standard that Rodriguez must meet to establish reasonable suspicion for an investigative stop. Unlike the arrest situation present in Baptiste v. J.C. Penney Co., in the context of an investigative stop, the "balance between the public interest and the individual's right to personal security, tilts in favor of a standard less than probable cause," and therefore "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." United States v. Arvizu, 534 U.S. at 273. See id. at 274 ("Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.")(citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 27 (1968). It is undisputed that Carbajal, then-County Clerk, initiated a "911" call and summoned Rodriguez to the GCAB. Nor is it disputed that Carbajal spent time with Rodriguez informing him of the allegations of harassment involving Ramos and Carbajal's staff. The Court believes that these allegations -- which a high-ranking, county official made -- and which identified Ramos individually, constitute "a particularized and objective basis for suspecting [Ramos] of criminal activity." United States v. Villagrana-Flores, 467 F.3d at 1273.

Ramos contends that, despite Carbajal's position, he is not a trustworthy source, because Ramos had been campaigning against Carbajal in the election for County Clerk. While this fact may have relevance in Ramos' claim against Carbajal, Ramos has not presented any evidence that Rodriguez was aware of Ramos' campaign activities or indicating why Rodriguez should not have, under the circumstances, believed Carbajal was a trustworthy source. Moreover, even if Rodriguez knew that Ramos had campaigned against Carbajal, it was also not unreasonable for Rodriguez to expect that Carbajal's obligation as a public official to uphold the constitution and laws of New

Mexico would supercede any political disagreements between the Carbajal and Ramos.[4]

Furthermore, unlike the videotape in Baptiste v. J.C. Penney Co., there was no "available and undisputed" evidence that Rodriguez chose to ignore. Baptiste v. J.C. Penney Co., 147 F.3d at 1259. Ramos asserts that "[a] reasonable officer could have stepped forward and done the minor or the most minuscule of investigation here to ask other individuals around what was going on." Transcript at 12:10-13 (Gonzales). The statements of Ramos' associates, however, are not undisputed evidence, and, even in the context of a probable-cause analysis, police officers are entitled to weigh the credibility of witnesses. See Baptiste v. J.C. Penney Co., 147 F.3d at 1259. Even if the Court agrees with Ramos and assumes that Rodriguez' removal of Ramos was an investigative detention, in determining whether there was reasonable suspicion for that detention, the Court should defer to Rodriguez' ability "as a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Stephenson, 452 F.3d at 1176.

Rodriguez was not required to conduct an investigation that might establish probable cause that Ramos was indeed harassing poll workers, or even be satisfied by a preponderance of the evidence that Ramos was engaged in inappropriate behavior. See United States v. Arvizu, 534 U.S. at 274. Ramos does not dispute that Rodriguez met with and spoke to Carbajal -- a high-ranking county official in charge of the election proceedings -- upon arriving at the GCAB. While perhaps not sufficient to establish probable cause, this discussion was a reasonable basis for Rodriguez to suspect that criminal activity may be afoot and that Ramos was engaged in such behavior, and was

---

[4]The Court understands that it must be careful not to weigh the credibility of potential witnesses at the summary judgment stage and must view all evidence in the light most favorable to Ramos as the party opposing summary judgment. Nevertheless, it notes that the fact that Morales, the candidate Ramos supported in the County Clerk election, won the election undermines Ramos' assertions regarding Carbajal's credibility.

sufficient to justify an investigative stop without violating the Fourth Amendment.

**III.   RAMOS HAS NOT SHOWN THAT THE FIRST AMENDMENT RIGHTS AT ISSUE IN THIS CASE WERE CLEARLY ESTABLISHED.**

Although the Court does not believe that, consistent with the Supreme Court's First Amendment jurisprudence and Tenth Circuit caselaw, that Rodriguez deprived Ramos of a First Amendment right, even if such a violation could be established, the Court believes that Rodriguez would still be entitled to qualified immunity, because, in the context of this case,  the proper application of clearly established law to the facts is unclear.  Moreover, to the extent the application of the law is clear, it is contrary to Ramos' position.

Ramos has not cited for the Court, and the Court has not discovered in its independent research, any Supreme Court or Tenth Circuit caselaw indicating a government office building or a polling place is a traditional public forum, in which any regulation of political speech would be subject to strict scrutiny.  To the contrary, federal case law indicates that government office buildings are non-public forums, and "the Government has the right to exercise control over access to the [] workplace in order to avoid interruptions to the performance of the duties of its employees." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 805-06.  See Mainstream Loudoun v. Bd. of Trs. of the Loudoun County Library, 24 F. Supp. 2d at 562.

To the extent that the GCAB should be construed as a polling place, the opinions that the plurality, Justice Scalia, and Justice Stevens filed in Burson v. Freeman all indicate to the Court that, if there is any settled designation for polling places, it is that they are not traditional fora, and therefore regulation of First Amendment activity is examined only for reasonableness.  Indeed, the Court believes that Justice Scalia's assertion in Burson v. Freeman that the public fora around the

polling place which the plurality described as "quintessential public forums," 504 U.S. at 196, -- such as parks, streets, and sidewalks -- are, on election day, nonpublic fora subject to reasonable, viewpoint-neutral regulation, see id. at 214 (Scalia, J., dissenting), confirms the unsettled nature of this legal question.  Nor does the Court believe that, in the absence of Supreme Court or Tenth Circuit precedent precisely on point, the weight of authority from other courts clearly establishes Ramos' position.  Rodriguez has cited to Marlin v. District of Columbia Board of Elections & Ethics, a case in which the United States Court of Appeals for the District of Columbia Circuit expressly held that the interior of a polling place was not a traditional public forum, nor a government-designated one, because it is not available for general public discourse, and "[t]he only expressive activity involved is each voter's communication of his own elective choice and this has long been carried out privately -- by secret ballot in a restricted space."  236 F.3d at 719.  At least one other Circuit Court of Appeals, the United States Court of Appeals for the Sixth Circuit, and at least one federal district court in the United States Court of Appeals for the Second Circuit, have reached the same conclusion as the District of Columbia Circuit.  See United Food & Commercial Workers Local 1099 v. City of Sidney, 364 F.3d 738, 749-50 (6th Cir. 2004)(holding that, "[b]y opening up portions of school and private property for use as polling places on election day, Ohio has not opened up a nontraditional forum for public discourse"); Cotz v. Mastroeni, No. 05 Civ. 2991 (WCC), 2007 U.S. Dist. LEXIS 13019, at **87-88 (S.D.N.Y. Feb. 23, 2007)("Polling places clearly are non-public fora and voters present are subject to various First Amendment restrictions, including those based on content."). Cf. Embry v. Lewis, 215 F.3d 884, 888 (8th Cir. 2000)(holding that Missouri's designation of a school as a polling place did not convert the portion of the school grounds not used for voting into a public forum).  Ramos has not cited, and the Court is not aware of, any authority taking a contrary position.

In summary, the law is not clearly established such that "a reasonable police officer would have known that by forcing Ramos to leave the [GCAB] on election night, Rodriguez abridged Ramos' First Amendment rights."  Ramos' Response at 8.  Both Supreme Court precedent and federal caselaw from outside the Tenth Circuit suggest that regulation of First Amendment rights within a government office building or a polling place may be permissible if the regulation is reasonably related to achieving compelling state interests.  Moreover, when combined with New Mexico statutes that expressly prohibit individuals from remaining on state property when those individuals interfere with the performance of official duties, and that require law enforcement officers to assist in maintaining order during elections at the direction of election judges, the Court finds that Rodriguez acted reasonably and did not violate Ramos' clearly established First Amendment right to political association.

With respect to his Fourth Amendment claim, Ramos confines his argument to his assertion that Rodriguez' encounter with Ramos was an investigatory detention for which Rodriguez had no reasonable basis.  See Ramos' Response at 10.  Because the Court has already concluded that even if Rodriguez' encounter with Ramos was a seizure, it was an investigative detention justified by reasonable suspicion, the Court need not address this argument again.

At the conclusion to his response, Ramos conflates his arguments and summarizes that "the law was clearly established in June 2004 that a law enforcement officer may not unreasonably and forcibly remove a citizen who is peacefully monitoring and discussing election results from a polling place" without violating the citizens' First and Fourth Amendment rights.  Ramos' Response at 10.  In support for his conclusion, Ramos cites Roberts v. United States Jaycees for the proposition that the Supreme Court "has long understood as implicit in the right to engage in activities protected by

the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Ramos' Response at 11 (quoting <u>Roberts v. U.S. Jaycees</u>, 468 U.S. at 622). Ramos does not address, however, the Supreme Court's acknowledgment in <u>Roberts v. United States Jaycees</u> that "[t]he right to associate for expressive purposes is not, however, absolute [and] [i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." <u>Roberts v. U.S. Jaycees</u>, 468 U.S. at 623. Ramos also does not account for more contemporary Supreme Court caselaw, such as <u>Cornelius v. NAACP Legal Defense & Educational Fund, Inc.</u> and <u>Burson v. Freeman</u>, that have upheld restrictions on First Amendment rights when the exercise of those rights interferes with the principal function of government property and that have expressly limited political association and political speech at and near polling places. Without addressing these contradictions, the Court does not believe that Ramos has satisfied his burden to demonstrate that the law is clearly established such that a reasonable policeman in Rodriguez' place would have known he was violating Ramos' First or Fourth Amendment rights by removing him from the GCAB at Carbajal's direction. To the contrary, to the extent that the law is clearly established, the Court believes it undermines Ramos' position.

The Court concludes that, when it views the evidence in the record and all reasonable inferences therefrom in the light most favorable to Ramos, Ramos has not established that a reasonable jury could find that Rodriguez deprived him of a right protected under the First or Fourth Amendments. Moreover, even if the Court assumes that Ramos' constitutional rights were violated, the Court does not believe that the law was clearly established to the extent that a reasonable police

officer in Rodriguez' position would have known that his actions were in violation of Ramos' First Amendment rights; rather, to the extent the law is clearly established, the law supports Rodriguez' belief that reasonable restrictions on Ramos' First Amendment rights at the GCAB were constitutional.  Because Ramos has not established that his constitutional rights were violated, or that the First Amendment law related to the facts of his case is clearly established in his favor, the Court finds that Rodriguez is entitled to qualified immunity and will grant summary judgment on his behalf.

**IT IS ORDERED** that the Defendant Sam Rodriguez's Motion for Summary Judgment and Memorandum in Support is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jane Gagne
Albuquerque, New Mexico

-- and --

R. Nathan Gonzales
Silver City, New Mexico

     *Attorneys for Plaintiff*

Lawrence R. White
Miller Stratvert, P.A.
Las Cruces, New Mexico

     *Attorneys for Defendant Sergeant Sam Rodriguez*